FILED
99 FEB -3 PM 3
U.S. DISTRICT CO
N.D. OF ALABAM

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| BRENDA BORDEN, | ) |
| Plaintiff, | ) ) ) |
| -vs.- | ) CV-97-P-1151-S ) ) |
| FIRST BANK OF CHILDERSBURG, | ) ) |
| Defendant. | ) |

ENTERED

FEB 0 3 1999

## MEMORANDUM OPINION

The defendant filed a Motion for Summary Judgment with this court on February 27, 1998. The court considered the motion at the May 29, 1998 motion docket and thereafter took the motion under submission. The plaintiff claims that she was sexually and racially discriminated against by her employer, First Bank of Childersburg, in violation of Title VII. The defendant denies any such allegations. After careful consideration, the court finds that the defendant's motion is due to be granted.

### Facts[1]

Brenda Borden, a black female, began working at First Bank of Childersburg ("the Bank") in June of 1986. Although Borden was initially hired as a payments and receipts teller, within months, she was promoted to the position of loan teller. As a loan teller, Borden was responsible for administering loan payments, balancing loans, and assisting the payments and receipts tellers.

At some point between 1993 and 1995, Borden asked Daniel Cleckler, the Chief Executive Officer of the Bank, to move her from the loan teller window in order to eliminate the cash handling

---

[1] The facts are presented in the light most favorable to the non-moving party.

part of her job. At that time, Borden was told that she could not be moved due to a shortage of payments and receipts tellers, but that the Bank would make the change at a later date, if possible. Sometime later, Gayle Figgs, who supervised the tellers and ran some of the operations, quit working for the Bank. Cleckler called in Borden, Memory Williamson, and Jackie McGilbery[2] to discuss splitting up Figg's former duties. According to Cleckler, after selecting the duties she wanted, Borden was assigned to a newly created administrative desk position. The new position was created to accommodate her desire to leave the teller window and to take advantage of her administrative skills. The position made her responsible for: customer service, bank reconciliations, balancing office subsidiary ledgers, new firm banks, correspondent bank accounts, and training new tellers. Because it did not involve handling loan payments of making loans, her new job represented a move away from the bank's loan window where she had spent most of her career.

In 1994, the Bank was forced to designate someone to be in charge of loan documentation because the Bank had experienced some problems in that area. Mark Burnette, the Senior Lender, was put in charge of loan documentation. Burnette trained Memory Williamson in managing the documents in order to assist him with the increaing work load. When Burnette decided to leave the Bank in 1996, rather than hire a replacement, the Bank decided to split up his duties. The Bank created a new position, Loan Administration Officer, and offered the position to Memory Williamson. Essentially, in creating the new position, the Bank took a loan teller position, removed the payments and receiving aspects of the job, and added loan document responsibility. However, it appears that the Bank did not post the job opening for the new position and no applications were taken.

Borden resigned from the Bank on August 16, 1996. Borden claims that she quit because of the Bank's decision to hire Williamson as the Loan Administrative Officer. In her resignation letter,

---

[2]Williamson and McGilbery are white females.

Borden accused the Bank of racial discrimination, but admits that this was her first attempt to complain to a supervisor or manager about the alleged acts of racial discrimination at the Bank. Byron "Louie" Henry, Chief Operations Officer, quickly sent to Borden, indicating that "a great misunderstanding has occurred between yourself, Danny [Cleckler] and me." Henry also explained that the Bank did not consider the plaintiff for the position because she had previously requested to be removed from the loan window, but that "we would be happy to place you in the loan department position, if that is your desire." The letter also stated, "[p]lease know that you are considered as one of our best employees. That is the reason we want you to return and that is why we are willing to offer you the position that you say was denied you." Borden did not respond to the letter. Instead, Borden's attorney sent a letter to the Bank stating that "Mrs. Borden is not interested in returning to the bank," that she was demanding $60,000.00 in settlement, and that she was also going to pursue a sexual harassment claim.

Borden further alleges that over approximately a ten year period, she recalls hearing an elderly employee use the word "Nigger" twice. Additionally, Borden was apparently involved in a conversation in which someone made a joke about a white person who got black toner on her face, and was "snarled at" in front of customers.

Borden filed suit against the Bank, alleging (1) race-based failure to promote,[3] (2) racially and sexually hostile work environment,[4] (3) constructive discharge, and (4) disparate treatment based on

---

[3] Although the plaintiff attempts to point out at least nine instances of alleged disparate treatment in promotions based on race, only one of the instances (the August 1996 promotion of Memory Williamson to the position of Loan Administration Officer) occurred within the 180 day time period proscribed by Title VII. Therefore, the only alleged act of discrimination of which the court will address is the August 1996 promotion.

[4] None of the instances of hostile work environment based on sex occurred within 180 days of the EEOC charge. Therefore, the court will not address this claim. The plaintiff's claim for sexually hostile work environment is due to be dismissed.

gender[5].

## Anaylsis

### I. Failure to Promote Based on Race

A prima facie case for a failure to promote claim requires the plaintiff to show four things: (1) that she was a member of a protected class, (2) that she was qualified for and applied for the promotion, (3) that she suffered an adverse employment decision, and (4) that someone outside the protected class was promoted. See Walker v. Mortham, 158 F.3d 1177 (1998) (stating that a plaintiff does not have to show that they were equally or more qualified that the successful applicant). However, where the failure to promote allegedly arises out of an "informal, secretive selection process . . . a plaintiff may raise an inference of intentional, racially disparate treatment without proving that he technically applied for, and failed to obtain, the promotion." Roberts v. Gadsden Memorial Hospital, 835 F.3d 793, 797 (11th Cir. 1988) (citing Carmichael v. Birmingham Saw Works, 738 F.2d 1126, 1133 (11th Cir. 1984)). Under this rationale, the court assumes for the purposes of this summary judgment motion that the plaintiff has met her prima facie case.

Even assuming, however, that the plaintiff has presented a prima facie case, the defendant has offered a legitimate, nondiscriminatory reason for not promoting the plaintiff to the position of Loan Administration Officer. Several years earlier, Borden requested, and was given, a promotion that did away with the "loan type" duties she held as a payments and receipts loan teller. Because of Borden's clear desire to move away from the loan area, it is difficult to imagine that a reasonable jury would find any discriminatory animus in the Banks' decision to promote Williamson to the position of Loan Administrative Officer. This is especially bolstered by the Bank's response letter after Borden's

---

[5]The plaintiff admitted in her deposition that she had no basis for a Title VII claim based on disparate treatment of female employees. As such, this claim is due to be dismissed.

resignation which clearly indicates that the Bank's reason for not promoting the plaintiff was based on its belief, whether or not correct, that the plaintiff did not want to work in the loan area.[6] Even though the Bank apparently held an incorrect belief as to the plaintiff's desire to return to the loan area of banking, it is nevertheless legitimate and nondiscriminatory belief. Because the plaintiff has not presented any evidence to the contrary, the defendant's motion is due to be granted on this claim.[7]

## II. Racially Hostile Work Environment

To establish a claim for racially hostile work environment under Title VII, a plaintiff must show that: (1) she belongs to a protected class, (2) she was subjected to unwelcome sexual harassment because of her race, (3) the harassment was so severe and pervasive that it interfered with a term, condition, or privilege of her employment and, (4) employer liability. See Burlington Industries, Inc. v. Ellerth, 118 S. Ct. 2257 (1998); Faragher v. City of Boca Raton, 118 S. Ct. 2275 (1998). However, "simple teasing . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment'." Faragher, 118 S. Ct. at 2283 (internal citations omitted) (citing Oncale v. Sundowner Offshore Services, Inc., 118 S. Ct. 998, 1003 (1998). In this case, no genuine issues of material fact exist with regard to the plaintiff's hostile work environment claim. The totality of the circumstances, frequency and severity of the acts, and the amount of interference with the employee's work performance do

---

[6]Indeed, the Bank offered to give Borden the promotion if she would return to work. Such a rapid response by the Bank offering her the position shows that, although Borden was clearly qualified, the Bank had mistakenly understood that she did not want to work with loans anymore.

[7]Even assuming the plaintiff did prevail on this claim, her compensatory damages would be nominal. The plaintiff quit shortly after the Loan Administrative Officer position was given to Williamson.

not support anything other than a dismissal of this claim. The few unrelated incidents of which the plaintiff complains amount to no more than just "the ordinary tribulations of the workplace." Faragher, 118 S. Ct. at 2284 (citing B. Lindemann & D. Kadue, Sexual Harassment in Employment Law 175 (1992)). No reasonable jury would find otherwise. The plaintiff's hostile work environment claim is due to be dismissed.

## III. Constructive Discharge

In order for a plaintiff to succeed on a claim for constructive discharge, she must show that her working conditions were so intolerable that a reasonable person in her position would have been compelled to resign. See Doe v. DeKalb County Sch. District, 145 F.3d 1441, 1550 (11th Cir. 1998). A plaintiff's subjective feelings about the employer's actions are not considered. "Subjective impressions as to the desirability of one position over another cannot control our decision." Id. (quoting Lee v. Russell City Bd. of Educ., 563 F.2d 1159, 1162 (5th Cir. 1985)). Rather, the court must use an objective standard in determining whether the employer's actions would have caused a reasonable person in the plaintiff's position to resign. Id. In this case, the plaintiff has not presented any evidence that would lead a reasonable jury to find that she was constructively discharged. Indeed, the evidence points directly to the opposite conclusion. Because no genuine issues of material fact exist concerning the plaintiff's constructive discharge claim, the claim is due to be dismissed.

## Conclusion

For the forgoing reasons, the defendant's motion for summary judgment is due to be granted on all of the plaintiff's claims.

Date: _Feb. 3_____, 1999.

_____
Chief Judge Sam C. Pointer, Jr.

Service List:
    Charles Thompson
    Kineshia Collins
    Lyman H. Harris
    Michael H. Cleckler